# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**ORGERON BROTHERS TOWING, LLC**          **CIVIL ACTION**

**VERSUS**          **NO: 11-3070-SS**

**HIGMAN BARGE LINES, INC.**

## ORDER AND REASONS

The parties consented to proceed before the assigned Magistrate Judge.  Rec. doc. 30.  There are three pending motions: (1) the motion of the defendants, Empty Barge Lines, Inc. ("EBL"), Higman Barge Lines, Inc. ("HBL") and Higman Marine Services, Inc. ("Higman Marine"), for partial summary judgment (Rec. doc. 57); (2) the motion of HBL and Higman Marine for partial summary judgment (Rec. doc. 58); and (3) the motion of EBL, HBL and Higman Marine to exclude testimony of Timothy Legendre, CPA (Rec. doc. 64).  These motions were briefed.  This order and reasons is dispositive of the two motions for partial summary judgment.  The pretrial conference is set for May 30, 2013 and trial is set for June 19, 2013.  Rec. doc. 74.

The plaintiff, Orgeron Brothers Towing, LLC ("Orgeron"), filed an amended complaint which replaced and superseded its original complaint.  Rec. doc. 9.  The statement of facts found in paragraphs 5-10 and 12-19 of the amended complaint are undisputed.

There are two contracts at issue.  They are referred to herein as the Purchase Agreement  for the M/V CAPT. Jerry Orgeron and the Charter Agreement for the same vessel.  The amended complaint describes three counts.  The first is for breach of the Purchase Agreement.  Orgeron seeks an order for the return of the vessel.  The second count is for breach of the two contracts, particularly failure to renew the Charter Agreement, which Orgeron alleges caused it to lose net charter of

$2,825 per day.  The third count is for unjust enrichment.  Orgeron alleges that if it is not entitled to the return of the vessel and/or compensation for lost hire, it is entitled to compensation relating to its expenditures in refurbishing the vessel and its purchase payments prior to the termination of the contracts.  Rec. doc. 9.

In the first motion, the defendants seek summary judgment: (1) as to the alleged breach of contract for the alleged failure of defendants to use their "best efforts" to renew the Charter Agreement; (2) for claims for damages after November 29, 2010; and (3) for the claim for unjust enrichment.  In the second motion, HBL and Higman Marine contend that there is no privity of contract between themselves and Orgeron.

## **Best Efforts**

The defendants contend that, because the contracts are silent as to what constitutes the parties' best efforts, the provision is unenforceable as a matter of law.

1.    Purchase Agreement

On July 3, 2007, George Thomas executed on behalf of Maryland Marine, Inc. (hereafter "HBL" unless otherwise noted)[1] the M/V Capt. Jerry Orgeron (formerly the M/V Capt. Jack Higman) the Bareboat Charter Party/Purchase Agreement.  On July 5, it was executed by Larry and Craig Orgeron on behalf of Orgeron.  Rec. doc. 9 (Exhibit A)(the "Purchase Agreement").  HBL was identified as the owner of the M/V Capt. Jerry Orgeron (the "Vessel").  Orgeron was identified as the Charterer of the Vessel.

Orgeron agreed to hire the Vessel commencing on July 1, 2007 for a period of 8 years.  Unless . . . [Maryland or Orgeron] shall cancel this . . . [Purchase Agreement] by

---

[1]  On January 9, 2009, Maryland changed its names to Higman Barge Lines, Inc.

written notice provided ninety (90) days prior to any purchase option date[2] or the expiration of the original eight (8) year term, this Charterer[3] shall terminate.[4]

Rec. doc. 9 (Exhibit A at 1).

The parties agreed that HBL retained no possession or control over the Vessel during the period of the Purchase Agreement, "except as provided under the terms of that certain Fully Found Charter Agreement between Orgeron Brothers Towing, LLC and HBL dated July 1, 2007 (copy attached as Exhibit A)." Id. at 1 ("Charter Agreement"). If the Charter Agreement was not renewed during the term of the Purchase Agreement, the Purchase Agreement "shall be canceled" and the Vessel delivered to HBL immediately. Id.

Orgeron acknowledged that it had the right to inspect the vessel before acceptance and agreed to rely solely on the inspection with respect to the condition of the Vessel. Id. Orgeron agreed to pay HBL $425.00 per day. The Purchase Agreement is governed by the general maritime law. Id. at 8. While HBL had the right to assign to it, Orgeron could not assign it without HBL's permission. Id.

2.    Charter Agreement.

The Charter Agreement was executed on behalf of Orgeron as owner and HBL as charterer.

---

[2] Orgeron had the right to purchase the vessel on July 1 in 2009 for $725,650, in 2011 for $521,160, in 2013 for $281,315, and in 2015 for $1.00. If Orgeron exercised its right to purchase, it was required to advise Maryland within 90 days of the option date. Rec. doc. 9 (Exhibit A at 7).

[3] The use of the word "Charterer" is a drafting error. Rather than "Charterer" (Orgeron), it should be "Charter".

[4] This sentence is confusing. Orgeron describes it as "somewhat vague." Rec. doc. 9 at 3. A concluding phrase concerning the date of termination may have been left out.

Unless . . . [HBL or Orgeron] shall cancel this . . . [Purchase Agreement] by written notice provided ninety (90) days prior to any purchase option date or the expiration of the original eight (8) year term, this . . . [Purchase Agreement] shall terminate *[on June 20, 2015]*.

3

Thus, the positions (owner and charterer) of the parties in the Charter Agreement are the reverse of their positions in the Purchase Agreement.  Orgeron agreed to furnish the Vessel to HBL at a rate of $3,000.00 per day.  The Charter Agreement "shall remain in effect for a period of two (2) years."  Rec. doc. 9 (Exhibit B at 1).

> Charterer [HBL] and Owner [Orgeron] agree to <u>use their best efforts</u> and renew this charter in two year intervals at mutually agreeable rates until July 1, 2015, or as long as that certain Bareboat Charter/Purchase Agreement dated July 1, 2007, is in full force and effect.

<u>Id</u>. (emphasis added).

There are three addenda to the Charter Agreement.  In the first, the parties agreed to extend the contract for 1 year to July 31, 2010 and, effective July 1, 2008, increase the daily rate from $3,000.00 to $3,100.00.  Rec. doc. 9 (Exhibit C).  The second addendum concerned HBL's sale of its interest in the Purchase Agreement to EBL.  Rec. doc. 9 (Exhibit D).  HBL and Orgeron agreed that the net charter hire payable from HBL to Orgeron would be $2,675.00 ($3,100.00 minus $425.00) per day.  The third addendum, effective August 1, 2008, increased the net charter rate to $2,825.00.  Rec. doc. 9 (Exhibit E).

3.    <u>Termination of the Contracts</u>.

On March 31, 2010, HBL notified Orgeron that the Charter Agreement was terminated effective April 30, 2010.  Rec. doc. 9 (Exhibit F).[5]  Orgeron continued to work the Vessel.  Rec. doc. 9 at 6.  The parties did not renew the Charter Agreement at the end of its July 31, 2010 term.  On October 6, 2010, HBL sent a 30 day notice of termination.  Rec. doc. 9 (Exhibit G).  On November 29, 2010, HBL directed the Vessel to its Orange, Texas facility where Orgeron released possession

---

[5]  The letter thanked Orgeron and the crew of the Vessel "for your years of valued service. It is our hope that an improving market may open future employment possibilities."

4

of the Vessel to EBL.

4.     Maritime Contract Interpretation.

      *Fitch Marine Transport, LLC v. American Commercial Lines, LLC*, 2010 WL 5057516 (E.D.

La.) (Lemmon, J.), states:

> This case involves the interpretation of charter agreements entered into between the parties.  It is well established that a charter agreement is a maritime contract.  *See Morewood v. Enequist,* 64 U.S. 491 (1860); see also *Stolt–Nielsen SA v. Celanese AG,* 430 F.3d 567, 572 (2nd Cir.2005).  Generally, courts apply federal common law to resolve maritime disputes.  *Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 886 (5th Cir.1991).  "However, to the extent that it is not inconsistent with admiralty principles, state contract law may be applicable to maritime contracts."  *In re Tasch, Inc.,* 46 Fed. Appx. 731 (5th Cir.2002) (citing *Ham Marine, Inc. v. Dresser Indus., Inc.,* 72 F.3d 454, 459 (5th Cir.1995).  When interpreting a maritime contract, the general rules of contract construction and interpretation apply.  *Marine Overseas Services, Inc. v. Crossocean Shipping Co., Inc.,* 791 F.2d 1227, 1234 (5th Cir.1986); *Ogea v. Loffland Bros. Co.,* 622 F.2d 186 (5th Cir.1980).  Each provision of a contract must be read in light of others so as to give each the meaning reflected by the contract as a whole. *Southwestern Eng'g Co. v. Cajun Elec. Power Co-op., Inc.,* 915 F.2d 972 (5th Cir.1990).  Further, each provision of a contract must be given a meaning that renders it, along with all other provisions, effective rather than meaningless. *See Lewis v. Hamilton,* 652 So.2d 1327 (La.1995).  "Interpretation of the terms of a contract is a matter of law."  *Weathersby v. Conoco Oil Co.,* 752 F.2d 953, 956 (5th Cir.1984).

2010 WL 5057516 at *2.

5.     Arguments of the Parties.

      Orgeron alleges that HBL breached the contract by failing to use its best efforts to renew the

Charter Agreement until June 30, 2015.  Orgeron claims breach of contract and damages.  HBL

contends that because the contracts are silent as to what constitutes the parties' best efforts, the best

efforts provision is unenforceable as a matter of law.  See Kevin M. Ehringer Enterprises, Inc. v.

McData Services Corp., 646 F.3d 321 (5th Cir. 2011)(applying Texas law in a diversity case).

      Orgeron responds that while Ehringer states the rule for Texas, it does not state the rule under

the federal common law or the majority rule for the states.  It argues that <u>Ashokan Water Servs., Inc.</u>

<u>v. New Start, LLC</u>, 11 Misc.3d 686, 807 N.Y.S.2d 550 (Civil Court, City of N.Y. 2006), provides the

rule which should be applied in this case:   "[a] best efforts requirement must be reconciled with other

clauses in the contract to the extent possible, not used as a basis for negating them."   <u>Id</u>. at 692.

Orgeron contends that courts will supply or imply the necessary guidelines if they can be gleaned

from the contract or the circumstances of the parties.

The parties have not cited a federal common law case concerning a best efforts provision.

6.    <u>Analysis - Ehringer</u>.

In <u>Ehringer,</u> the Fifth Circuit stated:

> [B]est efforts is a nebulous standard.  Under some circumstances, a party could use
> best efforts to achieve a contractual goal and fall well short.  Under different
> circumstances, an effort well short of one's best may suffice to hit a target.  Therefore,
> the court determined that to be enforceable, a best efforts contract must set some kind
> of goal or guideline against which best efforts may be measured.  If the contract sets
> out such goal or guideline, a contracting party that performs within the guidelines
> fulfills the contract regardless of the quality of its efforts.  When a party misses the
> guidelines, courts measure the quality of its efforts by circumstances of the case and
> by comparing the party's performance with that of an average, prudent, comparable
> party.

646 F.3d at 326 (citations, quotation marks and brackets omitted).

Orgeron concedes that the Charter Agreement does not provide explicit guidelines or

objective criteria to measure best efforts.  If <u>Ehringer</u> provides the applicable rule of interpretation,

Orgeron has no claim for breach of contract for HBL's failure to use its best efforts to renew the

Charter Agreement.   In <u>Ehringer</u>, the parties disagreed about whether Texas or Minnesota law

applied.  The Fifth Circuit noted that neither party demonstrated that the outcome would be different

if Minnesota law were applied.  <u>Id</u>. at 326, n. 2.  The Fifth Circuit followed its prior decision on the

interpretation of a best efforts clause in a contract in Texas.  <u>Herrmann Holdings, Ltd. v. Lucent</u>

6

Techs. Inc., 302 F.3d 552, 559 (5th Cir. 2002).

"[T]o the extent that it is not inconsistent with admiralty principles, state contract law may be applicable to maritime contracts." Fitch, 2010 WL 5057516 at *2 (citing In re Tasch, Inc., 46 Fed. Appx. 731 (5th Cir.2002)). The Court is persuaded that the Fifth Circuit would apply Ehringer to the interpretation of the "best efforts" clause in the Charter Agreement. Accordingly, Orgeron has no claim against HBL for breach of the Charter Agreement for failure to use its best efforts to renew the Charter Agreement. The defendants' motion for summary judgment is granted as to count two of Orgeron's complaint.

7.    Analysis - Ashokan.

Assuming *arguendo* that the Ashokan rule is applicable, what are the guidelines or objective criteria to be employed to determine whether HBL was using its "best efforts" to renew the Charter Agreement? Orgeron contends that: (1) HBL was required to offer and Orgeron was required to accept renewal based on the prevailing rates for similar sized and powered inland tugs; (2) the Vessel is a fairly common type; and (3) the day rates for such a vessel are readily ascertainable. Orgeron's criteria would have required renewal of the Charter Agreement at the then prevailing rate for similar vessels.

Orgeron argues that if the parties were not required to renew the Charter Agreement on such terms, the purchase option provisions in the Purchase Agreement are rendered meaningless. The Purchase Agreement contained purchase option dates at two year intervals. Orgeron was required to give HBL written notice 90 days prior to any option date of its intent to purchase the vessel. Rec. doc. 9 (Exhibit A at 1). The Purchase Agreement permitted either party to cancel the Purchase Agreement by written notice provided 90 days prior to any purchase option date. Orgeron urges that

the purpose of this provision was to provide it with 90 days to line up alternative financing to purchase the vessel in the event HBL decided to cancel the Purchase Agreement.

Orgeron's argument is deficient in three respects.  First, best efforts clauses are generally not enforced where the parties only agree to negotiate.  In <u>Pinnacle Books, Inc. v. Harlequin Enterprises Limited</u>, 519 F.Supp. 118 (S.D.N.Y.), the Court stated:

> While it is possible to infer from the circumstances the standard of performance required by a "best efforts" clause where the parties have agreed to work toward a specific goal, . . . it is not so here where the parties have agreed only to negotiate.  <u>The performance required by a contract to negotiate with best efforts</u>, unlike the performance required by a distribution contract or a patent assignment, <u>simply cannot be ascertained from the circumstances</u>.  Unless the parties delineate in the contract objective standards by which their efforts are to be measured, the very nature of contract negotiations renders it impossible to determine whether the parties have used their "best" efforts to reach a new agreement.  Certainly, no party to a negotiation, no matter what the circumstances, is required to make a particular offer nor to accept particular terms.  What each party offers or demands in the course of any negotiation is a matter left strictly to the business judgment of that party.  Thus, absent express standards, a court cannot decide that one party's offer does not constitute its best efforts; nor can it say that the other party's refusal to accept certain terms does not constitute its best efforts.

519 F.Supp. at 121-22 (emphasis added and citations and footnotes omitted).

Second, the entirety of the purchase option provisions were not rendered meaningless if the parties were not required to renew the Charter Agreement based on Orgeron's criteria.  The first purchase option date was unaffected by the failure to renew.  Orgeron possessed the right to purchase the Vessel on July 1, 2009 for $725,650.00.  It chose not to exercise this option.

Third, Orgeron's argument is inconsistent with another provision of the Purchase Agreement:

> Should for any reason whatsoever, the Vessel be no longer available to Owner under the terms of that certain Charter Agreement dated July 1, 2007 attached hereto as Exhibit A, or that Charter (Exhibit A) not be renewed during the term of this Charter, this Charter shall be canceled in it's [sic] entirety and the Vessel delivered to Owner immediately.

8

Rec. doc. 9 (Exhibit A at 1).  This provision provides two additional conditions under which the Purchase Agreement can be canceled: (1) the vessel is no longer available to HBL under the Charter Agreement; or (2) the Charter Agreement is not renewed.  Without the clause pertaining to the unavailability of the vessel, the provision reads as follows:

> Should for any reason whatsoever . . .  that Charter [Agreement] . . . not be renewed during the term of this . . . [Purchase Agreement], this . . . [Purchase Agreement] shall be canceled in its entirety and the Vessel delivered to [HBL] . . . immediately.

Not only did the Purchase Agreement plainly contemplate the possibility that the Charter Agreement might not be renewed, it provided that a decision not to renew could be made for any reason whatsoever.  This provision is inconsistent with Orgeron's contention that the parties were <u>required</u> to renew the Charter Agreement at the prevailing rate for the vessel.

Even if the <u>Ashokan</u> rule applies, the best efforts requirements in the Charter Agreement cannot be interpreted with the objective criteria sought by Orgeron and be reconciled with the other provision in the Purchase Agreement.

### Post November 29, 2010 Damages

The undisputed facts are:

1. On October 6, 2010, HBL sent Orgeron a letter with a 30-day notice of termination effective November 5, 2010.  Rec. doc. 9 (Exhibit G).

2. HBL worked the Vessel until on or about Monday, November 29, 2010.

3. HBL directed the Vessel to its dock in Orange, Texas.

4. Orgeron brought the Vessel to the dock at which point HBL and EBL notified it to turn over possession of the vessel to EBL.

5. On Wednesday, December 1, 2010, counsel for Orgeron sent a letter of protest to

HBL.  Rec. doc. 9 (Exhibit H).

6.      On Thursday, December 2, 2010, counsel for EBL wrote back denying Orgeron's

allegations.  Rec. doc. 9 (Exhibit I).

7.      On December 14, 2011, Orgeron filed it original complaint.  Rec. doc. 1.

The defendants contend that by voluntarily relinquishing possession upon presentation of the termination letter, Orgeron waived its right to bring claims for lost profits for the termination of the charter agreements.  Fitch Marine Transport, LLC v. American Commercial Lines, LLC, 2010 WL 5057516 (E.D. La.) (Lemmon, J.).  Orgeron and the Defendants dispute the significance of Fitch Marine.

In Fitch Marine, the plaintiffs entered into four pairs of Purchase Agreements and Charter Agreements for four vessels with American Commercial Lines ("ACL").[6]  These contracts were similar to the contracts at issue in this action.  On October 12, 2008, there was an incident involving the McKinney.  On October 13, the plaintiffs contacted ACL to report that the McKinney would be dry docked to investigate damage to its propellers. ACL contended that there had been a grounding which had not been properly reported.  The plaintiffs contended that the incident was not a grounding.  On October 17, ACL notified the plaintiffs that all four pairs of contracts were terminated. It presented a letter to plaintiffs reporting that the termination was effective immediately. The plaintiffs' representative, Larry Fitch, signed below the words "Agreed and Accepted" and immediately returned the four vessels.  Nine months later the plaintiffs sued and alleged that ACL improperly terminated the contracts.

---

[6] For this discussion of Fitch Marine, the four vessels are referred to as the Philpott, the Dobard, the Touchette and the McKinney.

On the plaintiffs' motion for summary judgment, the District Judge found that the termination of the contracts for the Philpott, the Dobard and the Touchette was not procedurally proper. After the trial, the District Judge found that: (1) the McKinney ran aground on October 12, 2008; (2) the grounding triggered ACL's right to immediately terminate the McKinney contracts; and (3) ACL's termination of the McKinney contracts was proper.

The District Judge found that the plaintiffs waived their rights to bring lost profits claims for the improper termination of the contracts for the other three vessels. The decision identifies five reasons for this finding:

1.   Larry Fitch understood that ACL was terminating all of the charter agreements when he signed the termination letter "Agreed and Accepted."

2.   He did not inform ACL that the termination letter was defective.

3.   Although plaintiffs had a contractual right by virtue of the charter agreements to retain possession of the vessels until the charter agreements were validly terminated, they returned them without asserting any such right.

4.   The plaintiffs could have asserted a claim of improper termination before returning the vessels.

5.   ACL had grounds to terminate the contracts for the three vessels.[7]

2010 WL 5057516, at *4. The decision concludes:

> Therefore, the court finds that Fitch Marine and Mohawk Freedom, through their principal, Larry Fitch, waived their right to bring claims for lost profits for the termination of the charter agreements by voluntarily returning the vessels upon presentation of the termination letter, and waiting nine months to assert a claim for

---

[7] On June 25 and August 25, the Philpott was involved in groundings. On July 22, the Touchett was involved in the grounding of a barge in which the barge almost sank. On August 12, there was a fuel spill off of the Dobard.

damages.

Id.

The defendants argue that the key issue in <u>Fitch Marine</u> was not the plaintiffs' delay in bringing a suit, but their failure to assert a claim before surrendering the vessels.  Orgeron responds that: (1) it immediately protested the termination of the Charter Agreement and dispossession of the Vessel; (2) it did not waive its right to bring a claim for damages; and (3) <u>Fitch Marine</u> is distinguishable because there was a delay of nine months between the receipt of a termination letter and the filing of the suit.

<u>Fitch Marine</u> is not controlling.  Unlike the plaintiffs in <u>Fitch Marine</u>, Orgeron did not wait an extended time before taking any action.  Within a few days of surrendering possession of the Vessel, its counsel protested Maryland's termination of the Charter Agreement and the Purchase Agreement.

In light of the determination that Orgeron has no claim for breach of contract based on the failure to renew the Charter Agreement, the issue is whether it has a claim for post-November 29, 2010 damages.[8]  **Within ten (10) calendar day of the entry of this order**, Orgeron and the defendants shall submit separate statements (no longer than three (3) pages) of the issues they contend remain for trial.

### Unjust Enrichment

The defendants contend that unjust enrichment claims are precluded by the existence of valid contracts.  It cites <u>Harley Marine Servs. v. Manitowoc Marine Group, LLC</u>, 759 F.Supp.2d 1059,

---

[8] Orgeron also contends that it was not paid for the net charter hire due for the period from November 15 to November 29, 2010.  Rec. doc. 9 at 8.

1063 (E.D. Wisc. 2010).  Orgeron responds:

> In light of the parties' agreement as to the existence and validity of the bareboat charter/purchase agreement and time charter, plaintiff is not entitled to the relief under the equitable doctrine of unjust enrichment, and thus withdraws this claim.

Rec. doc. 70 at 4.  Between the filing of its opposition on March 7, 2013 and the filing of its supplemental opposition on March 14, Orgeron reconsidered this position.  It contends that federal courts sitting in admiralty are entitled to a more liberal use of equitable doctrines.  Rec. doc. 81 at 4-5.  It does not cite any admiralty case where a party was permitted to pursue claims under maritime contracts and a claim for unjust enrichment relating to the subject matter of the contracts.  The defendants' motion for partial summary judgment on Orgeron's claim for unjust enrichment is granted.

## Privity of Contract

Maryland (HBL) was the owner of the Vessel when Orgeron entered into the Purchase Agreement.  The second addendum to the Charter Agreement reflects that HBL sold all of its right, title and interest in the Purchase Agreement to EBL.  Rec. doc. 9 (Exhibit D).  This addendum was signed by Orgeron.  The addendum does not provide that Orgeron released HBL from any of its obligations under the Purchase Agreement.

On January 9, 2009, Maryland changed its name to HBL.  Rec. doc. 58 (Memorandum at 2).  The two letters of termination were sent by HBL and not EBL.

HBL contends that Orgeron's breach of contract claims arise from the actions by EBL.  HBL seeks summary judgment in its favor based on no privity of contract with Orgeron.  Because Orgeron did not release HBL (formerly Maryland) when it signed the second addendum, HBL's request for partial summary judgment is denied.

Higman Marine Services, Inc. ("Higman Marine") also moves for summary judgment on the ground that it has no contract with Orgeron.  Orgeron admits that it has no evidence to support an *alter ego* theory for Higman Marine.  It contends that Higman Marine's request is premature because it has not had the opportunity to depose John McMahan, the president of Higman Marine, as a Rule 30(b)(6) representative.  It reports that this deposition was set for March 25, 2013.  Rec. doc. 68 at 5.  It adds that if the deposition does not produce evidence to support an *alter ego* theory for Higman Marine, it will consider dismissing Higman Marine.  More than two weeks have elapsed since the Rule 30(b)(6) deposition.  Orgeron has not submitted any evidence to support its *alter ego* theory. The motion for summary judgment is granted as to Higman Marine.

IT IS ORDERED that:

1.    The motion of the defendants, EBL, HBL and Higman Marine, for partial summary judgment (Rec. doc. 57) is GRANTED in PART and DENIED in PART as provided herein.

2.    The motion of the defendants, HBL and Higman Marine, for partial summary judgment (Rec. doc. 58) is GRANTED in PART and DENIED in PART as provided herein.  Higman Marine is dismissed.

3.    **Within ten (10) calendar day of the entry of this order**, Orgeron and the remaining defendants, HBL and EBL, shall submit statements of the issues they contend remain for trial. These statements shall be in letter form and no more than three (3) pages double spaced.

New Orleans, Louisiana, this 10th day of April, 2013.

**SALLY SHUSHAN**
**United States Magistrate Judge**